[No. A108629. First Dist., Div. Five. Jan. 31, 2006.]

108 HOLDINGS, LTD., et al., Plaintiffs and Appellants, v.
CITY OF ROHNERT PARK et al., Defendants and Respondents;
SOUTH COUNTY RESOURCE PRESERVATION COMMITTEE et al.,
Real Parties in Interest.

## COUNSEL

Sheppard, Mullin, Richter & Hampton, Philip F. Atkins-Pattenson, Elizabeth McDaniel, Kristen A. Jensen; Cooper & Kirkham, Josef D. Cooper and Tracy R. Kirkham for Plaintiffs and Appellants.

McDonough Holland & Allen, Michelle Marchetta Kenyon and Benjamin L. Stock for Defendants and Respondents.

Brandt-Hawley Law Group, Susan Brandt-Hawley and Paige J. Swartley for Real Parties in Interest.

## OPINION

**STEVENS, J.**—In this appeal, we must determine whether the City of Rohnert Park unlawfully surrendered its police power and improperly amended its general plan by entering into a settlement agreement and stipulated judgment to resolve litigation brought against it. 108 Holdings, Ltd., and S.C. Forty Acres, Inc., appeal from a judgment dismissing an action seeking declaratory and injunctive relief and a writ of mandate against the City of Rohnert Park, the Rohnert Park City Council, and the Rohnert Park Planning Commission (collectively the City). Appellants sued the City after it entered into a settlement agreement and stipulated judgment with real parties in interest South County Resource Preservation Committee and John E. King (collectively SCRPC) resolving a lawsuit brought by SCRPC that challenged the City's adoption of its general plan.

Appellants contended below, as they do in this court, that the settlement agreement and stipulated judgment unlawfully bargained away the City's ability to exercise its police power in the future and improperly amended the City's general plan. The superior court disagreed, and it sustained the City's demurrer to appellants, cause of action for writ of mandate and granted judgment on the pleadings to the City on appellants, causes of action for declaratory and injunctive relief. We conclude that the City neither surrendered its police power nor improperly amended its general plan. We therefore affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellants 108 Holdings, Ltd., and S.C. Forty Acres, Inc. (collectively 108 Holdings), are the owners of approximately 137 acres of property (the Property) located near the southeastern limits of the City of Rohnert Park. On January 16, 2003, 108 Holdings filed a "PETITION FOR WRIT OF MANDATE AND/OR ADMINISTRATIVE MANDAMUS; COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF" (the Complaint) against the City in Sonoma County Superior Court. The facts set out below are taken largely from the Complaint.

### A. Adoption of the City's General Plan and the Setting of the Urban Growth Boundary

On July 25, 2000, the City adopted a new general plan. According to the Complaint, the City's July 2000 general plan included all of the Property within the City's proposed sphere of influence, with a portion designated as open space and the remainder designated for industrial use. On that same day, the city council approved a resolution submitting to the voters

Ballot Measure N, a measure amending the general plan to establish a 20-year urban growth boundary. The majority of the Property is included within the urban growth boundary. The voters approved Measure N on November 7, 2000.

The city council adopted Resolution No. 2001-116 on May 22, 2001, and initiated an application to the Sonoma County Local Agency Formation Commission (LAFCO) to amend the City's sphere of influence in a manner consistent with the urban growth boundary established by Measure N. LAFCO approved the City's sphere of influence application on March 6, 2002, and this resulted in the Property's inclusion in the City's sphere of influence. As a result of LAFCO's approval, approximately 100 acres of land owned by 108 Holdings, Ltd., were within both the urban growth boundary and the City's sphere of influence, while 37 acres owned by S.C. Forty Acres, Inc., were outside the urban growth boundary but within the City's sphere of influence.

### B. *The SCRPC Action, The Settlement Agreement, and the Stipulated Judgment*

In August 2000, after the City's adoption of the general plan, SCRPC filed a petition for writ of mandate that challenged the adoption of the City's general plan on a number of grounds. The petition in the SCRPC action is not part of the record before us, but it appears that, in simplest terms, SCRPC's petition alleged that the City violated the California Environmental Quality Act (CEQA) in certain respects in adopting the general plan and in certifying the environmental impact report (EIR) for the general plan. According to the Complaint, the SCRPC action "requested a writ of mandate in the first instance ordering the City 'to set aside and void certification of the EIR and set aside approval of the General Plan and housing element project, and related approvals and to comply with all provisions of [CEQA] and other applicable laws prior to further consideration of the project.' "

The Complaint alleges that 108 Holdings learned on August 2, 2002, that the city council was planning to consider a proposed settlement of the SCRPC action at the council's August 6, 2002, meeting. 108 Holdings alleged that prior to August 2, 2002, it had not been informed of the terms of the proposed settlement. 108 Holdings objected to the terms of the proposed settlement agreement, and it sent a letter to the city council explaining its objections. Prior to the city council's hearing, the City distributed written material which purported to amend the proposed settlement agreement in certain respects. These revisions were not circulated for public review prior to the city council's hearing, and the city council considered them in closed session. It appears that the proposed settlement and the revisions were adopted, and the parties executed the agreement (the Settlement Agreement).

The superior court entered the stipulated judgment attached to the Settlement Agreement as an order of the court on September 5, 2002.

In the Settlement Agreement, the parties "acknowledge[d] and agree[d] that the judgment attached as Exhibit A contains provisions that will affect the City's interpretation and implementation of its General Plan when the City approves development projects and when the City evaluates those projects under CEQA and for General Plan consistency." Under the terms of the stipulated judgment, the City bound itself to interpret and apply its general plan in a manner specified in the stipulated judgment. As we will explain in greater detail later in this opinion, the City agreed to apply to LAFCO for an amendment of its sphere of influence affecting the Property and to interpret and apply certain policies concerning groundwater conservation, community design, and traffic in a manner set forth in the stipulated judgment.

On September 26, 2002, the City's planning commission held a public meeting at which it adopted a resolution recommending that the city council approve a general plan amendment removing the Property from the City's sphere of influence. On October 22, 2002, the city council held a public hearing to consider this proposed amendment of the general plan, after which the city council adopted the amendment.

### C. *108 Holdings's Action Against the City*

As noted earlier, 108 Holdings filed an action against the City, the city council, the Rohnert Park Planning Commission and various Doe defendants on January 16, 2003. The Complaint asserted five causes of action, only three of which are the subject of this appeal.[1] In its first cause of action, for declaratory relief, 108 Holdings contended that "[t]he City's amendment of the General Plan, and adoption of the Settlement [Agreement] are *ultra vires* acts on the part of the City." The Complaint alleged that the City was "prohibited from surrendering or impairing [its] delegated power, or that of successor legislative bodies either by ordinance or by contract." The Complaint further asserted that the City could not amend its general plan by contract without complying with CEQA or the statutory requirements governing the adoption of general plans. The first cause of action then set forth a number of statutory provisions that the City allegedly had contravened in amending its general plan.[2]

---

[1] 108 Holdings does not appeal from the dismissal of its fourth and fifth causes of action.

[2] The Complaint also alleged that the settlement of the SCRPC action violated "the federal and state constitutional equal protection and due process clauses" and that one of the Settlement Agreement's provisions was unconstitutionally vague. 108 Holdings does not assert these claims in this appeal.

In its second cause of action, 108 Holdings sought injunctive relief. The Complaint alleged that 108 Holdings would suffer irreparable harm if the City were not enjoined from taking steps in furtherance of the Settlement Agreement. The second cause of action made specific mention of the City's seeking of approval from LAFCO to amend the City's sphere of influence, an amendment that would result in the removal of the Property from the sphere of influence.

The Complaint's third cause of action sought a writ of mandate pursuant to Code of Civil Procedure section 1085. 108 Holdings alleged that the City's action in adopting the October 2002 amendment "effectively overturned years of public planning as to the Property." It further alleged that the City's action in adopting the October 2002 amendment was arbitrary, capricious, unlawful, and a violation of 108 Holdings's rights and that "[t]he sole reason that the City adopted the October 2002 Amendment was that the terms of the Settlement bound it to do so."

The City later filed general and special demurrers to each of the Complaint's five causes of action. The City initially demurred to the first and second causes of action on the grounds that (1) the Complaint was untimely and (2) the Complaint was barred by doctrines of preclusion because 108 Holdings had failed to appeal the denial of its motion for leave to intervene in the SCRPC action. The City demurred to the Complaint's third cause of action on the ground that 108 Holdings had failed to demonstrate entitlement to traditional mandamus because the Complaint failed to plead "a clear duty on the part of the City which has been breached."

On October 29, 2003, Judge Lawrence G. Antolini sustained the City's demurrer without leave to amend as to the Complaint's third cause of action. Judge Antolini concluded that the allegations of the Complaint demonstrated that the City had "simply entered into a settlement in which they promised to try to effect the changes complained of and that [the City's] actions and decisions that actually made the general plan and other changes followed the very procedures which [108 Holdings] assert were circumvented." Judge Antolini overruled the demurrer as to the first and second causes of action on the grounds asserted by the City, although he noted that his decision to sustain the demurrer cast doubt upon the validity of those causes of action as well.

Following the decision on the City's demurrer, the case was reassigned to Judge Robert S. Boyd. The City filed a motion for judgment on the pleadings as to the Complaint's first and second causes of action, arguing that the merits of those claims had been previously adjudicated in Judge Antolini's decision on the City's demurrer. Judge Boyd granted the City's motion on

September 22, 2004, stating that 108 Holdings's opposition was essentially "requesting this court to reconsider prior rulings." The superior court entered a judgment of dismissal on September 28, 2004. 108 Holdings appealed from that judgment on November 23, 2004.

## II. *DISCUSSION*

108 Holdings appeals from two orders—the order sustaining the City's demurrer to the Complaint's third cause of action and the order granting the City's motion for judgment on the pleadings as to the Complaints first and second causes of action. Because the parties have devoted most of their briefing to the questions raised by dismissal of the first and second causes of action, we address that matter first.[3]

### A. *Standard of Review*

Both a general demurrer and a motion for judgment on the pleadings are intended to test the sufficiency of a complaint. (*Pang v. Beverly Hospital, Inc.* (2000) 79 Cal.App.4th 986, 989 [94 Cal.Rptr.2d 643] (*Pang*).) In reviewing the superior court's ruling on either a demurrer or a motion for judgment on the pleadings, we are required to assume the truth of all properly pleaded factual allegations. (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 515–516 [101 Cal.Rptr.2d 470, 12 P.3d 720] (*Gerawan Farming*); *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]; *Pang, supra*, at p. 989.) This includes facts contained in exhibits to the complaint. (*Satten v. Webb* (2002) 99 Cal.App.4th 365, 375 [121 Cal.Rptr.2d 234].)

The scope of our review as to both orders is the same, and we review them de novo. (*Gerawan Farming, supra*, 24 Cal.4th at p. 515; *Pang, supra*, 79 Cal.App.4th at p. 989.) Judge Antolini's decision to sustain the City's demurrer presents a pure question of law subject to independent or de novo review. (*Noguera v. North Monterey County Unified Sch. Dist.* (1980) 106 Cal.App.3d 64, 66 [164 Cal.Rptr. 808].) Judge Boyd's ruling on the City's motion for

---

[3] In its statement of issues and in its discussion of the standard of review, 108 Holdings alludes to the trial court's refusal to grant it leave to amend the Complaint. But its brief contains no argument on or discussion of this point, and we therefore treat it as abandoned. (*Berger v. Godden* (1985) 163 Cal.App.3d 1113, 1120 [210 Cal.Rptr. 109] [where appellant's brief stated only that dismissal of cross-complaint was " 'contrary to law,' " court could deem appeal abandoned]; *Rossiter v. Benoit* (1979) 88 Cal.App.3d 706, 710–711 [152 Cal.Rptr. 65] [issue raised in party's statement of issues on appeal but not supported by any argument or citation of authority treated as abandoned], overruled on another ground in *Wilson v. Garcia* (1985) 471 U.S. 261, 275 [85 L.Ed.2d 254, 105 S.Ct. 1938]; see Cal. Rules of Court, rule 14(a)(1)(B) ["Each brief *must* [¶] . . . [¶] . . . state each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority" (italics added)].)

judgment on the pleadings presents a mixed question of law and fact that is predominantly legal in nature; it is therefore also subject to de novo review. (*Gerawan Farming, supra,* at p. 515.) With these standards in mind, we turn to the merits of the case before us.

### B. *The Superior Court Properly Granted the City's Motion for Judgment on the Pleadings.*

■ 108 Holdings asserts that the Settlement Agreement and stipulated judgment amended the City's general plan by private contract and that this amounts to an unlawful surrender of the City's police power. 108 Holdings claims that the court below simply ignored both the facts and law upon which these claims were based. We disagree because we conclude that the City's acceptance of the stipulated judgment does not constitute an improper surrender of its police power. We also reject 108 Holdings's argument that the City's agreement to interpret its general plan in a particular fashion amounts to an impermissible "amendment" of the general plan.

### 1. *The Settlement Agreement and Stipulated Judgment Are Not an Unlawful Surrender of the City's Police Power.*

108 Holdings's central contention is that the City surrendered its police power in entering into the Settlement Agreement and stipulated judgment. According to 108 Holdings, the Settlement Agreement and stipulated judgment constitute legislation by private contract and the City's agreement to certain provisions in these documents was thus an ultra vires act.

■ It is true that a municipality may not contract away its legislative and governmental functions. (*Morrison Homes Corp. v. City of Pleasanton* (1976) 58 Cal.App.3d 724, 734 [130 Cal.Rptr. 196] (*Morrison Homes*).) A long line of California cases establishes that a government may not bargain away its right to exercise its police power in the future. (E.g., *Avco Community Developers, Inc. v. South Coast Regional Com.* (1976) 17 Cal.3d 785, 800 [132 Cal.Rptr. 386, 553 P.2d 546]; *Delucchi v. County of Santa Cruz* (1986) 179 Cal.App.3d 814, 823 [225 Cal.Rptr. 43] (*Delucchi*).) The adoption and amendment of a general plan are legislative acts (*Yost v. Thomas* (1984) 36 Cal.3d 561, 570 [205 Cal.Rptr. 801, 685 P.2d 1152]), and this appellate division has held that such governmental power may not be surrendered or impaired either by ordinance or contract. (*Alameda County Land Use Assn. v. City of Hayward* (1995) 38 Cal.App.4th 1716, 1724 [45 Cal.Rptr.2d 752] (*Alameda County*).)

A contract that purports to do so is invalid as contrary to public policy if the contract amounts to a municipality's "surrender" or "abnegation" of its control of a municipal function. (*County Mobilehome Positive Action Com.,*

*Inc. v. County of San Diego* (1998) 62 Cal.App.4th 727, 736 [73 Cal.Rptr.2d 409] *(County Mobilehome); Morrison Homes, supra,* 58 Cal.App.3d at p. 734.) As the *County Mobilehome* court explained, "the controlling consideration in this area appears to be whether a disputed contract amounts to a local entity's 'surrender,' 'abnegation,' 'divestment,' 'abridging,' or 'bargaining away' of its control of a police power or municipal function." *(County Mobilehome, supra,* at p. 738; see also *Santa Margarita Area Residents Together v. San Luis Obispo County Bd. of Supervisors* (2000) 84 Cal.App.4th 221, 233 [100 Cal.Rptr.2d 740].) The inquiry thus turns on whether "this crucial control element has been lost." *(County Mobilehome, supra,* at p. 738.)

We do not believe that the Settlement Agreement and stipulated judgment amount to a surrender, abnegation, or bargaining away of the City's legislative power. We observe first that 108 Holdings does not assert that the City lacks the power to resolve land use litigation by means of a stipulated judgment, and case law demonstrates that this procedure has been used in the past. (See *Pardee Construction Co. v. City of Camarillo* (1984) 37 Cal.3d 465, 468 [208 Cal.Rptr. 228, 690 P.2d 701] *(Pardee)* [city stipulated to judgment resolving suit by developer of property].) Second, nowhere in the stipulated judgment does the City agree to refrain from legislating in the future on the matters that are the subject of the stipulated judgment. Nothing in the stipulated judgment suggests that the City has given up its authority to alter or amend its general plan as future circumstances may dictate.[4]

For this reason, the cases upon which 108 Holdings relies are inapposite. For example, in *County Mobilehome,* the county had imposed a 15-year moratorium on the enactment of rent control legislation with respect to mobilehome park owners who entered into an accord with the county. *(County Mobilehome, supra,* 62 Cal.App.4th at pp. 730, 731–732.) The accord specified that its provisions were to prevail over " 'any other action taken by County, including, without limitation, any policy regulation, rule or ordinance[.]' " *(Id.* at p. 732.) In addition, the county expressly agreed that it would not adopt any ordinance, rule, regulation, or initiative measure that would regulate the amount of rent that could be charged by mobilehome park

---

[4] Indeed, it appears that a provision in the draft settlement agreement that would have restricted the City's power to amend its general plan to include any land south of Valley House Drive within the City's sphere of influence was deleted from the final version approved by the court. The record contains what appears to be a draft of the stipulated judgment resolving the SCRPC action. The draft states that "[t]he General Plan shall permanently prohibit the filing of an application to amend the City's sphere of influence or the taking of any other action to include any land south of Valley House Drive . . . within its sphere of influence. The City shall not amend the General Plan to alter this prohibition." This language does not appear in the stipulated judgment. Thus, in the final version of the agreement approved by the court, the City was careful to preserve its power to legislate.

owners who signed the accord. (*Id.* at pp. 734–735.) The court held that this amounted to an unlawful surrender of the county's police power to regulate rents with respect to those owners who had entered into the accord. (*Id.* at pp. 739–741.) The court noted that if the county were to enact rent control legislation in violation of the accord, then it might expose the county to damages for breach of contract. (*Id.* at p. 739.) As the court explained, "[t]he vice of this ordinance, as tied to the Accord, is that it chills the County's exercise of police power for a specified time, even if there are significantly changed circumstances, through such potential exposure to litigation and damages." (*Id.* pp. 739–740.)

Here, in contrast, the terms of the stipulated judgment do not limit the City's ability to alter or amend its general plan should future events so require. Reservation of the police power is implicit in all government contracts and private parties take their rights subject to that reservation. (*Professional Engineers v. Department of Transportation* (1993) 13 Cal.App.4th 585, 591 [16 Cal.Rptr.2d 599] (*Professional Engineers*); see also *Delucchi, supra,* 179 Cal.App.3d at p. 823 [it is presumed that parties contract in contemplation of state's inherent right to unhampered exercise of police power].) Thus, "[w]e will not read into the contract[] an abrogation of the potential future exercise of the sovereign police power." (*Professional Engineers, supra,* at p. 591.) Unlike the accord at issue in *County Mobilehome,* the Settlement Agreement and stipulated judgment do not restrict the City's power to legislate in the future.

Nor is 108 Holdings's reliance on this appellate division's opinion in *Alameda County* well founded. In that case, the City of Hayward entered into a memorandum of understanding (MOU) with the City of Pleasanton and Alameda County concerning the use of a parcel of land, parts of which lay within all three jurisdictions. (*Alameda County, supra,* 38 Cal.App.4th at pp. 1719–1720.) All three parties agreed to use their best efforts to adopt into their respective general plans certain specified goals for the parcel. (*Id.* at p. 1720.) One provision of the MOU dictated that no further amendments to any of the parties' general plans would be effective unless parallel amendments to the other parties' general plans were also adopted. (*Ibid.*) We held that this provision was an unlawful surrender of each jurisdiction's power to amend its own general plan by providing other jurisdictions with an effective veto over such amendments. (*Id.* at pp. 1724–1725; accord, *City and County of San Francisco v. Cooper* (1975) 13 Cal.3d 898, 929 [120 Cal.Rptr. 707, 534 P.2d 403] (*Cooper*) [invalidating portion of school board resolution that purported to place terms of resolution beyond reach of future board action unless certificated employee council agreed to such future action].)

In contrast to the MOU at issue in *Alameda County,* the Settlement Agreement and stipulated judgment do not grant real parties in interest (or

anyone else) veto power over future general plan amendments. To the contrary, the stipulated judgment places no restrictions on the City's exercise of its police power in the future. There is simply no basis for concluding that, in entering into the Settlement Agreement and stipulated judgment, the City has sacrificed the "crucial control element" that is the hallmark of an improper surrender of police power.[5] (*County Mobilehome, supra,* 62 Cal.App.4th at p. 738.) Here, the City has resolved litigation in a manner that preserves its authority to legislate in the future. We perceive no impropriety in its doing so. (Cf. *Pardee, supra,* 37 Cal.3d at p. 472 [stipulated judgment reserved to city power to adopt ordinances within its police power with respect to plaintiff developer, so long as ordinances were not inconsistent with stipulated judgment].)

### 2. *The Provisions of the Stipulated Judgment Are Facially Consistent with the General Plan and Cannot Be Construed as Amendments.*

All of 108 Holdings's arguments proceed from the fundamental premise that the challenged provisions of the stipulated judgment constitute "amendments" to the City's general plan. But 108 Holdings offers little guidance on how a court is to determine whether the adoption of a given policy or interpretation by a local entity rises to the level of an "amendment" of its general plan that is subject to the strictures of Government Code section 65358, which governs the amendment of general plans. For its part, the City argues that the stipulated judgment does no more than set forth the manner in which the City will interpret certain provisions of its general plan. Thus, according to the City, the stipulated judgment cannot be said to effect an improper amendment of the general plan. We agree with the City on this point.

As 108 Holdings correctly notes, a general plan is a " ' "constitution" for future development' [citation] located at the top of 'the hierarchy of local government law regulating land use' [citation]." (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 773 [38 Cal.Rptr.2d 699, 889 P.2d 1019] (*DeVita*).) By statute, the general plan consists of "a statement of development *policies*" and includes diagrams and text "setting forth *objectives, principles, standards, and plan proposals.*" (Gov. Code, § 65302, italics added.) As the California Supreme Court has noted, "[t]he amendment of a general plan . . . is an act of formulating *basic* land use policy[.]" (*DeVita, supra,* at p. 781, italics added.)

---

[5] Although the case law is clear that this element of control is not lost unless a contract amounts to a surrender or abnegation of a municipality's police power, 108 Holdings would have us ignore well-established California law and adopt a far more restrictive view of the reserved powers doctrine. Indeed, at oral argument, counsel for 108 Holdings went so far as to contend that the City would unlawfully surrender its police power if it were to enter into an agreement with a third party in which the City promised merely to consider the best interests of the citizens of Rohnert Park in all it did. We find no support in the case law for placing such narrow limitations on a municipality's power to contract.

The Fourth Appellate District has characterized a general plan as "embody-[ing] *fundamental* land use decisions that guide the future growth and development of cities and counties." (*City of Santa Ana v. City of Garden Grove* (1979) 100 Cal.App.3d 521, 532 [160 Cal.Rptr. 907], italics added (*City of Santa Ana*).) Amendments to the general plan " 'have a potential for resulting in ultimate physical changes in the environment.' " (*DeVita, supra,* at p. 794, quoting *City of Santa Ana, supra,* at p. 532.)

All of this suggests that a general plan amendment is a change in a locality's most basic and fundamental land use policies. If the City agrees to take action that does no more than carry out policies already established in the City's general plan, it would seem that such action would not constitute a general plan amendment. (Cf. *Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 541 [277 Cal.Rptr. 1, 802 P.2d 317] [initiative measure that imposed building moratorium based upon specified traffic volume to capacity ratio at designated intersections not a general plan amendment because measure "resembles a zoning ordinance, not simply a statement of policy to govern future regulations"].) Save for the amendment of the City's sphere of influence, the provisions of the stipulated judgment of which 108 Holdings complains do not, it seems to us, rise to the level of general plan amendments. We will examine each of these in turn.

a. *The amendment of the City's sphere of influence*

The issue to which the parties devote most of their attention in this appeal is the City's agreement to seek amendment of its sphere of influence from LAFCO. It is clear that amending the sphere of influence constitutes an amendment of the general plan, but 108 Holdings acknowledges in its Complaint and in its brief that the City ostensibly followed the required procedures for seeking this amendment.[6] The City planning commission held a public meeting at which it adopted a resolution recommending that the city council approve a general plan amendment removing the Property from the City's sphere of influence. The city council then held a public hearing to consider the proposed amendment, after which the city council adopted the amendment. Nevertheless, 108 Holdings asserts that "[i]t does not matter that

---

[6] Because the adoption or amendment of a general plan is a legislative act, " 'the wisdom of the plan is within the legislative and not the judicial sphere[.]' " (*Dale v. City of Mountain View* (1976) 55 Cal.App.3d 101, 108 [127 Cal.Rptr. 520] (*Dale*), quoting *Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 118 [109 Cal.Rptr. 799, 514 P.2d 111].) As a consequence, " 'a landowner may not maintain an action in declaratory relief to probe the merits of the plan absent allegation of a defect in the proceedings leading to its enactment.' " (*Dale, supra,* at p. 108, italics omitted.) As *Dale* makes clear, 108 Holdings's action for declaratory relief is not a means to challenge the wisdom of the City's decision to amend its sphere of influence. Declaratory relief is available only if 108 Holdings alleges a defect in the proceedings leading to the enactment of the amendment of the City's sphere of influence.

the act of passing the resolution to implement the changes specified in the Settlement Agreement is, at least superficially, the same action required to pass any other municipal resolution. The resolution is still fatally tainted because its contents were dictated entirely by the terms of a private contractual agreement which abrogated the City's police powers." We do not agree with this line of reasoning.

 The California Supreme Court rejected a similar argument in *Cooper*. In that case, a taxpayer challenged measures adopted by the San Francisco Board of Supervisors and the San Francisco school board that were designed to settle a strike by schoolteachers. (*Cooper, supra,* 13 Cal.3d at p. 904.) The taxpayer asserted that the schoolteachers' strike was illegal, and thus any action taken under the coercion of the allegedly illegal strike was void as the product of illegal influences. (*Id.* at p. 913.) Our Supreme Court disagreed, holding that "the validity of legislative acts must be measured by the terms of the legislation itself, and not by the motives of, or influences upon, the legislators who enacted the measure." (*Ibid.*) The court explained that the separation of powers doctrine prohibits the judiciary from invalidating duly enacted legislation in the absence of some overriding constitutional, statutory, or charter proscription. (*Id.* at p. 915.) The judiciary simply has no power to void legislation "if it finds that the measure 'resulted from' certain illegal conduct[.]" (*Id.* at p. 916.)

Here, as in *Cooper,* we are asked to invalidate a legislative act that does not appear to violate any overriding constitutional, statutory, or charter proscription. (*Cooper, supra,* 13 Cal.3d at p. 915.) As we have explained previously, the Settlement Agreement and stipulated judgment do not amount to a surrender of the City's police powers because the City has not bargained away its power to enact legislation or to regulate in the future. 108 Holdings concedes that the appropriate public process was followed, and in such a case the City's action is reviewable only by the electorate, not the courts. (*Id.* at pp. 905, 918.) The trial court properly granted the City's motion for judgment on the pleadings on this issue.

b. *The remaining provisions of the stipulated judgment*

108 Holdings objects to various provisions in the stipulated judgment, contending that they amount to de facto amendments of the City's general plan.[7] From this, 108 Holdings argues that the acceptance of these provisions constituted legislation by private contract. As we explain below, most of the provisions to which 108 Holdings objects appear to be little more than restatements of policies that are already part of the general plan.

---

[7] The objectionable provisions of the stipulated judgment were not specifically identified in the Complaint, but in its briefs in this court, 108 Holdings makes arguments regarding paragraphs I.A., I.C., I.F., I.G., I.K., II., III., IV., and VI.

*Groundwater Supply and Conservation Issues: Paragraphs I.A., I.C., I.F., I.G., and I.K.*

A number of the terms in the stipulated judgment involve issues of groundwater supply and water conservation. 108 Holdings objects to paragraph I.A. because it requires the City to include, as a condition on any tentative map or equivalent permit for a project located outside of the City's 1999 boundaries, an identification of the water supply that is projected to serve that project. In addition, 108 Holdings challenges this paragraph because it states that the water supply for the City may not include groundwater pumped from a well located in Penngrove, which is defined as the area encompassed by ZIP code 94951. 108 Holdings does not explain how this is inconsistent with the general plan, and it appears that policy PF-11B of the general plan already requires the City to disapprove development outside the City's limits if the development requires water production that will exceed appropriate recharge rates. Penngrove lies outside the City, and 108 Holdings has identified nothing in the City's general plan that would previously have permitted the City to include groundwater from wells located in Penngrove in the City's water supply.

108 Holdings has not identified any inconsistency between the general plan and the remaining water supply and conservation provisions of the stipulated judgment. Paragraph I.C. of the stipulated judgment requires the City to add four additional wells to its groundwater well monitoring program, but a monthly groundwater monitoring program is already established under the general plan's water supply and conservation policies. (General plan, policy PF-11A.) 108 Holdings also challenges the portion of this provision that allows SCRPC to reject the additional wells called for in the stipulated judgment and to propose other existing wells from which groundwater data should be gathered, arguing that such an arrangement constitutes legislation. But paragraph I.C. of the stipulated judgment provides that if SCRPC objects to any of the additional monitoring wells, then the City and SCRPC will select an independent hydrologist who will determine which wells are most likely to provide accurate information. Thus, the City has not ceded complete control of the process of selecting monitoring wells.

Paragraph I.F. of the stipulated judgment, to which 108 Holdings also objects, states that "[t]he City shall require any applicant for development to implement applicable on-site conservation programs that are recommended by the [Sonoma County Water Agency] in its best management practices for water conservation." But the conservation provisions of the general plan already provide that the City will "[r]equire non-residential uses to implement water conservation practices as a condition of development," and they specifically refer to SCWA's water conservation practices. Likewise, paragraph I.K. of the stipulated judgment commits the City to replacing its

"current flat fee structure with a fee structure that is based upon consumption and that penalizes excessive use so as to reduce water consumption within the City." Here again, policy PF-25 of the City's general plan appears to commit the City already to adopt a rate schedule that "increases as the quantity of water used increases . . . or provides seasonal rates or excess-use surcharges[.]"[8]

We do not see how these provisions of the stipulated judgment, which seem at least facially consistent with the terms of the general plan, can be considered legislation or amendments to the general plan.

### Community Design Element: Paragraph III

The Complaint alleges that the stipulated judgment unlawfully purports to amend goal CD-G of the general plan.[9] Paragraph III of the stipulated judgment refers to this goal, but all that it requires of the City is that the City listen to and consider concerns expressed by members of the Penngrove community during the public hearing process and to consider in good faith any such concerns. The City is also obligated to provide two weeks' notice of the City's hearing of applications to develop land adjacent to Penngrove, if Penngrove residents request such notification, and to consider their comments in good faith. We cannot see how this paragraph amends goal CD-G, as it commits the City to do nothing more than to consider the views of Penngrove residents on development projects that might affect their community. We presume that the City would do this in any event. This provision simply cannot be construed as an amendment of the City's general plan.

### Traffic: Paragraph IV

The Complaint alleges that the stipulated judgment imposes "unlawful conditions on future development[.]" One of the allegedly unlawful conditions is contained in paragraph IV of the stipulated judgment. The relevant

---

[8] 108 Holdings also challenges paragraph I.G. of the stipulated judgment, in which the City agreed that, consistent with the EIR, it will not approve any discretionary project outside of the City's 1999 boundaries, the net consumptive water use of which would contribute to the City's exceeding a specified annual groundwater pumping rate from municipal and private wells. 108 Holdings does not specify the basis of its objection to this provision, other than to argue that it constitutes legislation. It appears that the challenge to this provision may depend upon its consistency with the EIR, but the EIR is not part of the record before us. In the absence of an adequate record, this challenge must fail. (See, e.g., *Gee v. American Realty & Construction, Inc.* (2002) 99 Cal.App.4th 1412, 1416 [122 Cal.Rptr.2d 167] [if record does not permit meaningful appellate review, the decision of the trial court should be affirmed].)

[9] Goal CD-G of the general plan provides: "Encourage development of diverse and distinctive neighborhoods that build on the patterns of the natural landscape and are responsive in their location and context. [¶] *This General Plan encourages development of neighborhoods to be responsive to their location and context, rather than being based on a uniform design formula.*"

portion of that paragraph reads: "When planning for and approving development within the City's amended Sphere of Influence, the City will incorporate, *to the extent feasible,* measure to reduce vehicle miles traveled per capita from residential to commercial uses within the development. Such measures *may include* carpooling incentives, high-speed commuter access, bicycle-and pedestrian-friendly project design, project access, and contribution to regional solutions." (Italics added.)

We observe first that this provision appears to leave the City wide discretion in choosing what traffic mitigation measures it may adopt. The City is only required to incorporate these measures to the extent they are feasible, and the provision states only what measures the City may include, not what it must include. Second, paragraph IV of the stipulated judgment seems entirely consistent with policies TR-21A and TR-21B of the general plan. Those policies already commit the City to working with other jurisdictions to mitigate the impacts of increased traffic congestion. The City's agreement to incorporate, if feasible, any of a number of traffic mitigation measures when planning for and approving development can hardly be termed an amendment of its general plan.

*Inclusion in the General Plan: Paragraphs I, II, III, VI, and VII*

108 Holdings makes much of the language in the stipulated judgment that states that the interpretations and applications contained in the stipulated judgment "shall be treated as part of the General Plan" and requiring that the City include a copy of the stipulated judgment in any and every published edition of its general plan. It also draws our attention to the language in the Settlement Agreement stating that "[t]he Parties acknowledge and agree that the [Stipulated Judgment] attached as Exhibit A contains provisions that will affect the City's interpretation and implementation of its General Plan when the City approves development projects and when the City evaluates those projects under CEQA and for General Plan consistency."

██ 108 Holdings offers this language as evidence that the provisions of the Settlement Agreement and stipulated judgment constitute improper amendments to the general plan. But as we have shown, these "interpretations" and "applications" appear consistent with the goals set forth in the general plan itself. That the City has agreed to include them as an appendix to its general plan does not demonstrate that they are amendments or that they constitute "legislation."[10] A number of titles of the United States Code contain appended material, the source of which is often another branch of

---

[10] We note that although the Settlement Agreement and stipulated judgment are included as an appendix to the general plan, only the City's amendment of its sphere of influence appears in the general plan's "log of amendments."

government, but the fact that the material appears in an appendix to the code does not transform it into congressional legislation. (See, e.g., 5 U.S.C. Appen. [reorganization plans prepared by executive branch]; 28 U.S.C. Appen. [rules of procedure for the federal courts adopted by the Supreme Court].)

108 Holdings appears to take the position that the City may never interpret or apply its general plan without subjecting itself to the procedures required by Government Code section 65358. But the courts have recognized that "[g]eneral plans or policy statements are often semantical exercises which require considerable interpretation on the part of persons charged with implementing them." (*Bownds v. City of Glendale* (1980) 113 Cal.App.3d 875, 883 [170 Cal.Rptr. 342].) Were we to agree with 108 Holdings, the City would be obliged to treat virtually any interpretation of its general plan as an amendment thereto. 108 Holdings simply offers no authority for requiring such an approach.

C. *The Superior Court Properly Sustained the City's Demurrer to the Complaint's Third Cause of Action for Writ of Mandate.*

108 Holdings's request for a writ of mandate was based on the City's October 22, 2002, decision to approve an amendment to the general plan removing the Property from the City's sphere of influence. The claim was that the City had failed to carry out its ministerial duty to follow the statutory provisions governing amendments to general plans.

We agree with the City that the lower court properly sustained the demurrer. As Judge Antolini pointed out, the Complaint alleges that the October 22, 2002, amendment was made only after "a public hearing of the Planning Commission at which the Planning Commission recommended the changes and a subsequent public hearing of the City Council at which the City Council adopted the changes at issue." Under Code of Civil Procedure section 1085, the court's scope of review was limited to determining whether, as 108 Holdings alleged, the City had "failed to follow the procedure and give the notices required by law." (*Karlson v. City of Camarillo* (1980) 100 Cal.App.3d 789, 798 [161 Cal.Rptr. 260].) Because the Complaint did not allege any defect in the proceedings that led to the adoption of the October 22, 2002, amendment, the City's demurrer was properly sustained. (See *Dale, supra,* 55 Cal.App.3d at p. 108 [court properly sustained demurrer to complaint for declaratory relief arising out of general plan amendment where complaint alleged no defect in the proceedings leading to adoption of amendment to general plan].)

## III. *DISPOSITION*

The judgment is affirmed.

Jones, P. J., and Gemello, J., concurred.

Appellants' petition for review by the Supreme Court was denied May 10, 2006, S141825. George, C. J., did not participate therein.